**ASSOCIATION OF DATA PROCESSING SERVICE ORGANIZATIONS, INC., and Data Systems, Inc., Appellants,**

v.

**William B. CAMP, Comptroller of the Currency of the United States, and American National Bank and Trust Company, Appellees.**

**No. 19218.**

United States Court of Appeals
Eighth Circuit.

Feb. 6, 1969.

Bert M. Gross, of Shanedling, Phillips, Gross & Aaron, Minneapolis, Minn., and Milton R. Wessel, of Kaye, Scholer, Fierman, Hays & Handler, New York City, for appellants; Felix M. Phillips, of Shanedling, Phillips, Gross & Aaron, Minneapolis, Minn., was on the brief and reply brief with Bert M. Gross, Minneapolis, Minn.

Stephen R. Felson, Atty., Dept. of Justice, Washington, D. C., for appellee Camp; Edwin L. Weisl, Jr., Asst. Atty. Gen., Dept. of Justice, Alan S. Rosenthal, Atty., Dept. of Justice, and Patrick J. Foley, U. S. Atty., Minneapolis, Minn., were on the brief and supplemental brief and appendix for appellee Camp with Stephen R. Felson.

Fallon Kelly, of Kelly, Segell & Fallon, St. Paul, Minn., for appellee American National Bank and Trust Company, and filed brief.

Matthew Hale, Gen. Counsel, Washington, D. C., filed brief for The American Bankers Association as amicus curiae.

Before VOGEL, LAY and BRIGHT, Circuit Judges.

LAY, Circuit Judge.

Plaintiffs appeal from an order dismissing their complaint against the Comptroller of the Currency of the United States and the Minnesota domiciled American National Bank and Trust Company. One of the plaintiffs is Association of Data Processing Service Organizations, an incorporated association of data service organizations domiciled in Pennsylvania whose members perform data processing services throughout the United States. It is hereinafter referred to as ADAPSO. The other plaintiff, Data Systems, Inc., is a Minnesota corporation engaged in the data processing business, with its principal place of business in Minneapolis. The complaint seeks equitable relief against the defendants and a "determination of the powers granted national banking associations under [the National Bank] Act as set forth in 12 U.S.Code § 24." It is alleged that by administrative rule the Comptroller of the Currency has authorized national banks to perform data processing services for bank customers in violation of 12 U.S.C. § 24 which gives national banks only "incidental powers as shall be necessary to carry on the business of banking." Plaintiffs allege that as a result of the unauthorized action ADAPSO members are threatened with the loss of a substantial part of the data processing market.[1] It is alleged that American National now performs data processing services for two companies with whom Data Systems had "negotiated" as prospective customers.

Jurisdiction is asserted by reason of an alleged federal question arising under the banking laws of the United States. 12 U.S.C. §§ 21 et seq. The trial court dismissed plaintiffs' complaint for lack of jurisdictional standing. We affirm.

The question of standing serves as a test of federal jurisdiction. Standing is the constitutional prerequisite related to whether a justiciable "case or controversy" exists. Involved is an examination to determine whether the plaintiffs have a personal stake legally sufficient "to assure that concrete adverseness" which avoids merely abstract determinations. Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). See also Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). Justiciability, although not always related to standing, becomes definitively attached when we consider whether the legal relationships of parties are such that they are aligned with adverse legal interests.

Plaintiffs assert standing in that they have been and will continue to be economically injured by *illegal* competition

---

1. We need not decide whether ADAPSO as an association can properly allege "loss of competition" on behalf of its members when it is not engaged in the data processing business itself. See discussion Jaffe, Judicial Control of Administrative Action 542-543 (1965).

of the national banks. Whether a litigant has standing to challenge competitive injury has been the subject of extended litigation and discussion. Doctrinal rules have developed a maze of conceptualistic abstractions and theories which at times are viewed and applied as being indistinguishable one from another. See Baker, Watts & Co. v. Saxon, 261 F.Supp. 247 (D.D.C.1966), aff'd sub nom., Port of N. Y. Authority v. Baker, Watts & Co., 129 U.S.App.D.C. 173, 392 F.2d 497 (1968); Saxon v. Georgia Ass'n of Ind. Ins. Agents, Inc., 399 F.2d 1010, 1019 (5 Cir. 1968) (concurring opinion).[2]

The trial court here has observed that language in Rural Elec. Admin. v. Northern States Power Co., 373 F.2d 686 (8 Cir. 1967) (denying standing)[3] and in Webster Groves Trust Co. v. Saxon, 370 F.2d 381 (8 Cir. 1966) (allowing standing)[4] seems to state divergent principles, either of which could govern in the instant case. However, all legal principles must be qualitatively analyzed within the context of factual surroundings. Much of the confusion on standing seems to arise from the emphasis upon the issues to be adjudicated or upon the possible merits of the substantive claim rather than upon an examination of the *status* of the complaining plaintiff. Whether or not a defendant is alleged to be engaged in illegal competition cannot by itself determine a plaintiff's standing to complain. Cf.

City of Chicago v. Atchison, T. & S. F. Ry., 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958) and note 8 infra. Chief Justice Warren has stated, "The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." However, he added, " * * * it is both appropriate and necessary to look to the substantive issues for another purpose, namely, to determine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated." Flast v. Cohen, 392 U.S. 83, 99, 102, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968).

Whether a party may or may not challenge allegedly illegal competition by others is best evaluated by examining the various factual circumstances within which the courts have discussed a particular plaintiff's standing and competitive injury.

Perhaps most well known are the so-called "power cases," where the threatened economic loss arises from government-created competition. In these situations the embryo of the competition by the defendant is generally found in congressional legislation. But even though the validity of such legislation is challenged, or an attack is made on the authority of a government agent to loan money, the courts uniformly have denied standing to competitors who otherwise possess no legal right to be free from competition.[5] This group of cases is represent-

---

2. See also extended discussion in 3 Davis, Administrative Law 208–294 (1958); Jaffe, Judicial Control of Administrative Action 500–531 (1965). And more recently Davis, Standing: Taxpayers and Others, 35 U.Chi.L.Rev. 601 (1968).

3. We stated in *Northern States*, 373 F.2d 692:

    "[A]ppellees readily recognize that the interest of the economic competitor is not sufficient standing to challenge the authority or discretion of the Administrator to make loans."

4. We stated in *Webster Groves*, 370 F.2d 388:

    "[W]hen a competitor believes he is being subjected to illegal competition

owing to impropriety by the Comptroller, the courts should be open to hear and decide the alleged wrong."

5. In addition, even though the attack upon a government program to loan money is alleged to be illegal, this does not make the competition itself legally wrong. This is explained because "the borrower owes him [the plaintiff] *no obligation* to refrain from using the proceeds in any lawful way the borrower may choose." Alabama Power Co. v. Ickes, 302 U.S. 464, 480, 58 S.Ct. 300, 304, 82 L.Ed. 374 (1938). (Emphasis ours.)

ed by Tennessee Elec. Power Co. v. TVA, 306 U.S. 118, 137, 59 S.Ct. 366, 369, 83 L.Ed. 543 (1939), which early emphasized:

"The appellants invoke the doctrine that one threatened with direct and special injury by the act of an agent of the government which, but for statutory authority for its performance, would be a violation of his legal rights, may challenge the validity of the statute in a suit against the agent. The principle is without application unless the right invaded is a legal right,— one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege."

See also Rural Elec. Admin. v. Northern States Power Co., supra.

Secondly, in contrast to the "power" cases are situations where a plaintiff, possessing a public grant or contract to operate, seeks to prevent a competitor from entering into an area of regulated and *restricted* competition. Representative of these cases is Frost v. Corporation Comm'n, 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483 (1929). This court has applied the rationale of *Frost* to a suit by a state bank against the Comptroller to prevent illegal competition. Webster Groves Trust Co. v. Saxon, 370 F.2d 381 (8 Cir. 1966). As observed in Whitney Nat'l Bank in Jefferson Parish v. Bank of New Orleans & Trust Co., 116 U.S.App.D.C. 285, 323 F.2d 290 (1963), rev'd on other grounds, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965), involved is a property right arising out of a public charter which bestows a *legal* interest on a state bank to complain.[6]

Closely related but significantly different are those cases involving areas of competition which because of public interest find need of public licensing as opposed to a public grant or contract.[7]

6. The branch banking provisions of the National Bank Act make the establishment of branch banks subject to the law of the states. 12 U.S.C. § 36. A primary purpose in doing so is to ensure competitive equality between state and national banks. First Nat'l Bank of Logan, Utah v. Walker Bank & Trust Co., 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966). It has accordingly been held that this provision gives state banks a sufficient legal interest to provide them with statutory standing to challenge the legality of branching by national banks. See National Bank of Detroit v. Wayne Oakland Bank, 252 F.2d 537 (6 Cir. 1958), discussed in Hoosier State Bank of Ind. v. Saxon, 248 F.Supp. 233 (N.D.Ind.1965). The contrast between basing a state bank's standing on a "property right" arising out of its charter and standing by reason of its inclusion within the class intended to be protected by the National Bank Act is one without essential difference. Perhaps the most realistic approach is that the right indigenous to the charter is protected by the statute.

7. The Court stated in FCC v. Sanders Bros. Radio Station, 309 U.S. 470 at 474, 60 S.Ct. 693 at 697, 84 L.Ed. 869 (1940):
"In contradistinction to communication by telephone and telegraph, which the Communications Act recognizes as a common carrier activity and regulates accordingly in analogy to the regulation of rail and other carriers by the Interstate Commerce Commission, the Act recognizes that broadcasters are not common carriers and are not to be dealt with as such. Thus the Act recognizes that the field of broadcasting is one of free competition. The sections dealing with broadcasting demonstrate that Congress has not, in its regulatory scheme, abandoned the principle of free competition, as it has done in the case of railroads, in respect of which regulation involves the suppression of wasteful practices due to competition, the regulation of rates and charges, and other measures which are unnecessary if free competition is to be permitted.
"An important element of public interest and convenience affecting the issue of a license is the ability of the licensee to render the best practicable service to the community reached by his broadcasts. That such ability may be assured the Act contemplates inquiry by the Commission, *inter alia*, into an applicant's financial qualifications to operate the proposed station.
"But the Act does not essay to regulate the business of the licensee. The Commission is given no supervisory control of the programs, of business management or of policy. In short, the

Here plaintiff-competitors are considered to be without a private "legal right" to protest unauthorized competition, but nevertheless find standing by specific legislation as "aggrieved persons" to act in the public interest. See, e. g., FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940); Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942). Cf. Office of Communication of United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994 (1966). In these cases *Congress* has patently recognized need for judicial review even though the competitive business controlled is considered free and otherwise unrestricted.[8]

Fourth, there are situations where competitors are given standing to challenge competition which is allegedly in violation of a statute, where the statute itself is said to be enacted for the express protection of the class of competitor complaining. The most recent example of these cases is found in Hardin v. Kentucky Util. Co., 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968).[9] Plaintiffs' reliance on recent cases against the Comptroller fall within facile classification of this rule. See, e. g., Baker, Watts & Co. v. Saxon, 261 F.Supp. 247, supra, as ex-

---

broadcasting field is open to anyone, provided there be an available frequency over which he can broadcast without interference to others, if he shows his competency, the adequacy of his equipment, and financial ability to make good use of the assigned channel."

8. But cf. City of Chicago v. Atchison, T. & S. F. Ry., 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958). The Supreme Court recognized standing of a municipal licensed public transportation system to intervene and attack the entry of one seeking to compete in an alleged violation of a city ordinance. The Court made clear that standing of the intervenor could not be viewed from examination of the merits as to whether in fact the competition was or was not illegal. Parmelee, the intervenor, for many years had enjoyed an arrangement with the railroad to transport passengers between stations. Parmelee was notified of its termination. A competitor, Railroad Transfer Service, was subsequently given this business notwithstanding a city ordinance that prohibited it from doing so without a license from the city. The Court found that Parmelee had "a direct and substantial personal interest in the outcome" and allowed standing. The ordinance was then held unconstitutional as being repugnant to the Interstate Commerce Act and the intervenor lost.

This case may best be categorized with those instances where standing to challenge illegal competition is implicitly found within a legislative enactment, be it an existing ordinance or statute, valid or not. Cf. Alton R. R. Co. v. United States, 315 U.S. 15, 19, 62 S.Ct. 432, 86 L.Ed. 586 (1942).

9. The Supreme Court said:
"This Court has, it is true, repeatedly held that the economic injury which results from lawful competition cannot, in and of itself, confer standing on the injured business to question the legality of any aspect of its competitor's operations. Railroad Co. v. Ellerman, 105 U.S. 166 [26 L.Ed. 1015] (1882); Alabama Power Co. v. Ickes, 302 U.S. 464 [58 S.Ct. 300, 82 L.Ed. 374] (1938); Tennessee [Electric] Power Co. v. TVA, 306 U.S. 118 [59 S.Ct. 366, 83 L.Ed. 543] (1939); Perkins v. Lukens Steel Co., 310 U.S. 113 [60 S.Ct. 869, 84 L.Ed. 1108] (1940). But competitive injury provided no basis for standing in the above cases simply because the statutory and constitutional requirements that the plaintiff sought to enforce were in no way concerned with protecting against competitive injury. In contrast, it has been the rule, at least since the Chicago Junction Case, 264 U.S. 258 [44 S.Ct. 317, 68 L.Ed. 667] (1924), that when the particular statutory provision invoked does reflect a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance with that provision. See Alton R. Co. v. United States, 315 U.S. 15, 19 [62 S.Ct. 432, 435, 86 L.Ed. 586] (1942); [City of] Chicago v. Atchison, T. & S. F. R. Co., 357 U.S. 77, 83 [78 S.Ct. 1063, 1066, 2 L.Ed.2d 1174] (1958).
"Petitioners concede, as of course they must, that one of the primary purposes of the area limitations in § 15d of the Act was to protect private utilities from TVA competition." Hardin v. Kentucky Util. Co., 390 U.S. at 5–6, 88 S.Ct. at 654.

plained in Investment Co. Institute v. Camp, 274 F.Supp. 624, 636 (D.D.C. 1967); Saxon v. Georgia Ass'n of Ind. Ins. Agents, Inc., 399 F.2d 1010 (5 Cir. 1968).[10]

Fifth, the last group of "competition" cases relates to a plaintiff's unsuccessful challenge of a competitor's alleged *ultra vires* acts affecting plaintiff's non-regulated area of commerce. This factual setting is best illustrated by Railroad Co. v. Ellerman, 105 U.S. 166, 26 L.Ed. 1015 (1882). In that case the plaintiff, who had contracted with the city of New Orleans to collect revenue from users of the city wharves, sought to enjoin a railroad company from operating wharves in New Orleans. He alleged this action would constitute illegal competition because the state statute authorizing the company to operate wharves was unconstitutional. The principle here furnishes an analogue to that in the "power cases" where the conduct of the defendant, although alleged to be illegal is nevertheless considered "lawful" with respect to the plaintiff because of the total absence of legal interest found in plaintiff's status.[11]

■ In summary, a plaintiff may challenge alleged illegal competition when as complainant it pursues (1) a legal

---

10. We do not share confidence in the alternative holding in Saxon v. Georgia Ass'n of Ind. Ins. Agents, Inc., 399 F.2d 1010 (5 Cir. 1968), that outside the "statutory aid to standing" plaintiffs had "a legal right to protect themselves from unlawful competition." Id. at 1018. The emphasis that plaintiff's standing arises out of the allegation of "unlawful competition" as contrasted to "lawful competition" seemingly relates standing to the merits of the claim to be adjudicated rather than the status of a party to complain. For a similar critique, see Judge Thornberry's concurring opinion 399 F.2d at 1020 n. 3.

11. This is explained by Mr. Justice Matthews in Railroad Co. v. Ellerman, 105 U.S. at 173–174, 26 L.Ed. 1015:

"The sole remaining question then, is, whether Ellerman, as assignee of the city, has any legal interest which entitled him to enjoin the company from using its wharf as a public wharf beyond the limits of such use, as defined by that construction, of the joint resolution. If he has such interest, it can only consist in preventing competition with himself as a wharfinger, which such more extensive use of the railroad property would create. And if the right to assert it exists, it must rest, not upon the claim that the premises are thus used for purposes to which they might not be lawfully devoted if owned and used by a natural person, but on the allegation merely that such use is beyond the corporate powers of the company. But if the competition in itself, however injurious, is not a wrong of which he could complain against a natural person, being the riparian proprietor, how does it become so merely because the author of it is a corporation acting *ultra vires*? The damage is attributable to the competition, and to that alone. But the competition is not illegal. It is not unlawful for any one to compete with the company, although the latter may not be authorized to engage in the same business. *The legal interest which qualifies a complainant other than the State itself to sue in such a case is a pecuniary interest in preventing the defendant from doing an act where the injury alleged flows from its quality and character as a breach of some legal or equitable duty.* A stockholder of the company has such an interest in restraining it within the limits of the enterprise for which it was formed, because that is to enforce his contract of membership. The State has a legal interest in preventing the usurpation and perversion of its franchises, because it is a trustee of its powers for uses strictly public. In these questions the appellee has no interest, and he cannot raise them in order, under that cover, to create and protect a monopoly which the law does not give him. The only injury of which he can be heard in a judicial tribunal to complain is the invasion of some legal or equitable right. If he asserts that the competition of the railroad company damages him, the answer is, that it does not abridge or impair any such right. If he alleges that the railroad company is acting beyond the warrant of the law, the answer is, that a violation of its charter does not of itself injuriously affect any of his rights. The company is not shown to owe him any duty which it has not performed." (Emphasis ours).

interest by reason of public charter or contract, Frost v. Corporation Comm'n, supra, (2) a legal interest by reason of statutory protection, Baker, Watts & Co. v. Saxon, supra, or (3) a "public interest" in which Congress has recognized the need for review of administrative action and plaintiff is significantly involved to have standing to represent the public, FCC v. Sanders Bros. Radio Station, supra. From this analysis, it seems clear that an allegation of "illegal competition" is not the balancing determinant of a plaintiff's standing. The primary search must rest on whether the plaintiff's status is one which enjoys a private interest entitled to protection or is one which the law recognizes to be of such legal significance to allow a party to act as a public representative for a public interest.

In the instant case the facts clearly place plaintiffs outside those cases which recognize standing. Plaintiffs are competing in a non-regulatory field of free competition. They possess no private legal interest nor do they plead any legal harm which is recognized at law. Their status is not one which places them within a class designedly protected by statute.[12] In direct accord see Wingate Corp. v. Industrial Nat'l Bank, 288 F. Supp. 49 (D.R.I.1968); Arnold Tours, Inc. v. Camp, 286 F.Supp. 770 (D.Mass. 1968).

Plaintiffs' argument is in essence an equitable plea, that in effect they have a personal stake to pursue, even though not a legal one, but nevertheless one which makes them logical parties to protect the public interest from illegal actions of government agencies.

The problem with their plea is many-fold. Congress has not seen fit within the National Bank Act to recognize any "aggrieved person" to assert the public's rights. Congress has not expressed a public concern for protection as found in FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940), and its progenitors. Without a legal interest or the status of a recognized "aggrieved" party, the complaint resolves itself into an attempt merely to show "a common concern for obedience to law." L. Singer & Sons v. Union Pac. R. R., 311 U.S. 295, 304, 61 S.Ct. 254, 258, 85 L.Ed. 198 (1940). As pronounced in *Singer,* outside statutory consent, the general or common interest can find protection only in the standing granted to public authorities. Unless a relevant statute provides for a "party in interest" to seek judicial review or unless a complainant possesses a recognized legal interest, he lacks standing to be a "private attorney general" to represent the public interest. See Kansas City Power & Light Co. v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924 (1955); Braude v. Wirtz, 350 F.2d 702, 707, 708 (9 Cir. 1965).[13]

Mr. Justice Frankfurter best describes judicial obligation to avoid review when legal standing is not otherwise involved:

"The jurisdiction of the federal courts can be invoked only under circumstances which to the expert feel of lawyers constitute a 'case or controversy.' The scope and consequences of the review with which the judiciary is entrusted over executive and legislative action require us to observe these bounds fastidiously." Joint

12. The National Bank Act has never been construed to give a private litigant standing to complain concerning *ultra vires* acts of national banks relating to executed contracts. See National Bank v. Matthews, 98 U.S. 621, 25 L.Ed. 188 (1878). Although distinctive policy arguments exist for this rule, nevertheless there exists no legislative history nor do plaintiffs offer any serious contention that the National Bank Act was intended to give these private litigants standing to litigate al-

leged *ultra vires* activities of national banks. The reliance on the Bank Holding Company Act of 1966 and the Bank Service Corporation Act is misplaced. Neither act is applicable here.

13. See also our prior discussions concerning the applicability of the Administrative Procedure Act in Rural Elec. Admin. v. Northern States Power Co., 373 F.2d at 692 n. 9.

Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 150, 71 S.Ct. 624, 637, 95 L.Ed. 817 (1951) (concurring opinion).

Judgment affirmed.